In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00086-CV**
_____

**THOMAS ANDREW MORRELL AND CABRINA MORRELL, Appellants**

**V.**

**MARTHA J. MORRELL, Appellee**

On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. B-201,248

## MEMORANDUM OPINION

Appellants Thomas Andrew Morrell and Cabrina Morrell appeal the trial court's judgment awarding appellee Martha J. Morrell ("Martha") $801,000 in total actual damages, 100% of PAM Properties, LLC ("PAM"); a constructive trust and declaration that Morrell Portable Buildings is owned by PAM; and a constructive trust in favor of Martha on three pieces of property belonging to Appellants. Appellants complain that the trial court erred by finding that a gift assignment that Martha made to Andrew is void and that Appellants breached their fiduciary duty to

1

Martha. Appellants also complain that Martha lacks standing to seek personal recovery of damages sustained by PAM, the monetary award is excessive and not supported by factually sufficient evidence, and that they were wrongfully deprived of a jury trial. We affirm the trial court's judgment.

BACKGROUND

In 1999, Martha and her husband, Roy J. Morrell ("Roy"), executed The Morrell Family Revocable Living Trust Agreement ("Trust Agreement"), designating themselves as Co-Trustees and their children, Paul J. Morrell, Marian K. Morrell, and Thomas Andrew Morrell ("Andrew") as the beneficiaries. Martha and Roy retained the power to revoke the Trust Agreement in part or in whole. In 2005, Martha and Roy executed a First Amendment to the Trust Agreement, which did not make any significant changes. In 2006, when Roy was President of PAM, the Trust Agreement's primary real estate assets, which include commercial property on Highway 69 ("the Property") and Roy's and Martha's house and acreage on Tolivar Canal Road ("Tolivar Canal Road property") were deeded to PAM, which uses the Trust Agreement's name as an assumed name. PAM also uses Andrew's personal business, Morrell Portable Buildings, as an assumed name.

In 2007, Martha executed a General Durable Power of Attorney in favor of Appellants. In 2008, Martha and Roy executed a Second Amendment to the Trust Agreement, which changed the beneficiary designations to state that Andrew would

2

receive his one-third interest out right and Marian's and Paul's interests would be put into another trust to be managed by Andrew. In 2010, Roy died, and Andrew and his family moved in with Martha at the Tolivar Canal Road property.

In 2017, Martha revoked the Trust Agreement and her General Power of Attorneys in favor of Appellants. In January 2018, Martha filed suit against Appellants and PAM,[1] alleging that as her power of attorney, Andrew breached his fiduciary duty and assumed and exercised dominion and control over her income and assets in an unlawful manner for his own benefit. Martha alleged that Appellants hold money that in equity and good conscience belongs to her and have taken her assets and income without her consent. According to Martha, she was living in a trailer on a wooded piece of property in Tyler County ("Tyler County property") while Appellants collected her income and used it for their personal interest. Martha sought a full accounting of her assets and income in Appellants' possession, as well as an accounting of PAM's expenses and income. Martha also alleged that Andrew used her assets to purchase commercial property ("the Hazen property") in his name, and Martha sought a declaratory judgment that she is the owner of the Hazen property. Martha sought a temporary restraining order, temporary injunction, and

---

[1]PAM is not a party to this appeal because Appellants did not file a notice of appeal on behalf of PAM.

3

permanent injunction to protect her assets and income from imminent harm from Appellants.

Martha alleged that Andrew used the General Durable Power of Attorney to take possession and control of her real property, cash, and financial assets to "siphon off cash and enrich his own interests and his own businesses." Martha also alleged that Andrew tricked her into signing the Second Amendment to the Trust Agreement, which changed the beneficiary designations to state that Andrew would get his one-third interest outright and Marian's and Paul's interests would be put into another trust to be managed by Andrew. According to Martha, she disagreed with the Second Amendment to the Trust Agreement and claimed that Andrew did not explain the changes to her.

Martha further alleged that Andrew merged and combined his personal business, Morrell Portable Buildings, with the Trust Agreement and PAM, and even though she owns the Property on which Andrew operates Morrell Portable Buildings, Andrew does not pay any rent or expenses. According to Martha, Andrew failed to pay the taxes on the Property, which has numerous tenants, and Andrew has funneled the tenants' rent through Morrell Portable Buildings. Martha also alleged that Andrew breached his fiduciary duty combining his interests with hers and using her assets and sources of income to buy the Hazen property solely in his name. Martha explained that Andrew used PAM's bank account for Morrell Portable

4

Buildings, and Appellants diverted the Trust Agreement's mineral payments for their own personal use. Martha also explained that in 2010, she and Roy were Members of PAM and Andrew was a Manager, but as of 2015, Andrew is showing himself as a Member or owner of PAM.

In January 2018, the trial court granted Martha a temporary restraining order and set a hearing on Martha's request for a temporary injunction. In February 2018, Martha and Appellants entered into an Agreed Temporary Injunction which provided that Andrew would (1) be reinstated as the Manager of PAM; (2) continue to operate Morrell Portable Buildings and manage PAM; (3) be enjoined from selling, transferring, or disposing of any of PAM's assets; (4) provide a monthly accounting of PAM's income, expenses, and financial activity; (5) pay all bills and expenses for Martha, PAM, Morrell Portable Buildings, and/or the Trust Agreement; (6) enjoined from interfering with Martha's peaceful possession of the Tyler County property; (7) instruct the other individuals residing on the Tyler County property not to interfere with Martha's peaceful possession; (8) allow Martha to place a FEMA trailer on the Tolivar Canal Road property; and (9) not attempt to contact Martha. The Agreed Temporary Injunction also ordered Martha to not contact Appellants or their children.

In March 2018, Martha filed a First Amended Petition and Request for Injunctive Relief in which she alleged that after she filed suit, Andrew disclosed a

5

Gift Assignment that purportedly shows that Martha gifted Andrew 100% of her interests in PAM, which included the Property, the Tolivar Canal Road property, and the Tyler County property. Martha alleged that she had no recollection of signing a document to that effect and claimed that it was a direct result of Andrew breaching his fiduciary duty and exercising undue influence over her. According to Martha, she was hospitalized after attempting suicide shortly before signing the Gift Assignment because of Andrew's treatment toward her. Martha alleged that she was controlled by Andrew's overpowering influence, resulting in her signing a Gift Assignment that provided for an unnatural property disposition that did not reflect her true wishes. In her breach of fiduciary duty claim, Martha alleged that as her power of attorney and Manager of PAM, Andrew breached his formal fiduciary relationship by taking advantage of her and having her sign the Gift Assignment, which was not fair and equitable to Martha. Martha sought a declaratory judgment that the Gift Assignment was void as it was the product of undue influence and the material breach of fiduciary duties.

In April 2018, Martha filed a Second Amended Petition and Request for Injunctive Relief, in which she alleged that in 2014, Andrew completed his deception by getting her to transfer 100% of PAM to him. Martha added two additional exhibits to her petition which show that in 2014, Martha executed a deed transferring the Tyler County property from PAM to herself individually and a second deed

6

transferring the Tyler County property from herself to the Trust. According to Martha, since she revoked the Trust Agreement, she owns the Tyler County property outright, and neither Andrew nor PAM have any right to that property. Martha sought to enjoin Appellants from accessing or possessing the Tyler County property. Martha also sought a declaratory judgment that PAM and Appellants have no rights or interest in the Tyler County property. In May 2018, Appellants filed a Counter-Petition against Martha, alleging causes of action for conversion and trespass and requesting a temporary restraining order and injunction. In September 2019, Martha filed a Third Amended Petition and Request for Injunctive Relief, in which she sought an additional declaration that Morrell Portable Buildings is owned by both her and PAM.

On October 10, 2019, Andrew requested a jury trial, and Appellants filed a motion for continuance requesting the trial court reset the case, which was set for trial on the non-jury docket on October 28, 2019, to provide thirty days' notice of the jury demand and payment of the jury fee. Appellants argued that the failure to file a jury demand and pay the jury fee was a result of a mistake by Appellants' counsel and that there was good cause for granting a continuance since there was no harm in resetting the case. Martha objected to Appellants' jury demand as being untimely pursuant to Texas Rule of Civil Procedure 216.

The trial court conducted a hearing on Appellants' motion for continuance, during which Appellants argued that the parties submitted an agreed docket control order signed by the trial court indicating there was going to be a jury trial, and as soon as Appellants' counsel realized the jury fee had not been paid, he filed a jury demand, a jury fee and a motion for continuance. The clerk's record contains an Agreed Amended Discovery Control Plan Order dated May 20, 2019, which shows that the case was set for a jury trial on October 28, 2019. Martha's counsel argued that a nonjury trial was always contemplated as indicated by the dockets, and Rule 216 requires a party to make a jury demand and pay the fee not less than thirty days in advance, which Appellants failed to do. Martha's counsel also argued that a continuance would be extremely unfair and prejudicial due to Martha's health. The trial court denied Appellants' motion for continuance and stated that it would proceed on the trial date with a nonjury trial.

In May 2020, the trial court conducted a bench trial on Martha's claims that a fiduciary relationship existed between her and Appellants, the Gift Assignment was a result of undue influence and the fiduciary relationship, and Appellants breached their fiduciary duty. Marian testified that her parents, Martha and Roy, formed PAM, which is an acronym for Paul, Andy, and Marian, to manage their commercial rental property and to ensure their children would have an equal interest. According to Marian, the Trust Agreement was also supposed to provide that the children be equal

8

beneficiaries, and she was unaware that it had been amended. Marian testified that Andrew gradually took control over her parents' finances, and Appellants communicated directly with her parents' attorney, Joe Broussard. Marian also testified that in 2008, Broussard sent the Trust Agreement's second amendment directly to Andrew instead of her parents.

Marian testified after Roy passed away in 2010, Andrew and his family moved in with Martha at the Tolivar Canal Road property, and around 2012 or 2013, Marian and Martha reconnected after Andrew's daughter attempted suicide. According to Marian, Martha told her that Andrew took over her home and was pressuring her to put her assets in Andrew's name. Marian testified that Martha told her there was a fire at the farmhouse on the Tyler County property and there was an insurance claim even though Martha had never insured it. Marian also testified that Martha told her that Andrew sold Diamond Emporium, the jewelry store property, without telling her.

Marian testified that she was surprised to learn that in September 2013, Martha had sent Broussard an email requesting him to put the Property in Andrew's name, because she was not aware of Martha using email to communicate with people during that time and because the email referred to Broussard as "Joe" instead of "Joey." Marian explained that in November 2013, she moved back to live with Martha at the Tolivar Canal Road property because Martha had hinted that she

9

needed help. Marian testified that she observed Appellants disrespecting Martha, disregarding her wishes, and that Andrew controlled Martha's money. Marian also testified that Andrew argued with Martha about signing papers to turn over her assets to him.

Marian explained that she was surprised to learn that in March 2014, Martha sent Broussard an email informing him that she wanted to transfer all her ownership in PAM to Andrew as soon as possible, because Martha did not want to give Andrew ownership of PAM. According to Marian, Martha's computer was in her bedroom and her passwords, which were on stick-it notes, were accessible to anyone. Marian testified that a week after the email was sent Martha attempted suicide, and when Martha returned home from the hospital, Cabrina told Martha that she should have taken the whole bottle of pills instead of just enough to do what she did. Marian explained that Andrew continued to argue with Martha about transferring her assets, and Martha was upset and wanted to be left alone. Marian testified that she went to Broussard's office to tell him that she thought Andrew was exploiting Martha by pressuring her to give him her assets.

Marian testified that an email dated April 14, 2014 at 11:58 p.m., from Martha to Broussard stated that Martha understood Andrew's reason for wanting her assets in his name and that she was making her decision with a clear mind and full understanding. Marian explained that when that email was sent, Martha was

10

depressed, sad, and hopeless due to the tremendous pressure from Andrew and his family to give Andrew control. Marian testified that the day after that email was sent, Martha attempted suicide a second time, and due to her concerns about Martha, Marian sent an email informing Broussard that Andrew had yelled at Martha for several hours the night before her suicide attempt.

Marian testified that when Martha was in the hospital, she used her cell phone to record her conversations with Martha so Broussard would know what was happening with Andrew, and Marian sent the recordings to Broussard. In the recording, Martha stated she wanted all her children and grandchildren and that she was miserable because Andrew runs everybody off. Martha also stated that Andrew is "greed beyond belief" and was going to "tie up the money" or may have already taken it out. Martha stated that the trust was at Andrew's discretion and she wanted Broussard to do a new trust, and she wanted to be in a unit where she felt safe. Marian testified that Martha asked her to have Broussard come to the hospital to meet with her, but Broussard could not meet and never rescheduled. Marian explained that they had a family counseling session while Martha was in the behavioral unit, and Andy yelled at Martha and the counselor called security to have Andrew removed. According to Marian, after that incident, Martha did not want to see anyone because she was afraid.

11

Marian testified that after Martha left the behavioral unit she returned home with Andrew, and Marian went to stay with her brother, Paul, because Andrew threw her belongings out of the house. Marian explained that she was concerned about Martha going home with Andrew because the doctors told her that it was not a safe place for her. Marian testified that in May 2014, she sent Broussard the email with the recordings and explained that Martha was being isolated and that she and Paul could not communicate or visit with Martha, but Broussard did not respond. According to Marian, on July 8, 2014, Martha executed the Gift Assignment, giving Andrew 100% of her membership interest in PAM, including the Tolivar Canal Road property, which Martha no longer had access to because Andrew changed the locks.

Marian explained that in 2017, she reconnected with Martha after the Tolivar Canal Road property flooded during Hurricane Harvey and Andrew's family and Martha moved to the Tyler County property. Marian testified that Martha told her Appellants were mistreating her and leaving her at the Tyler County property without a vehicle. Marian also testified that Martha told her she had to close her personal bank account and open a new account for her Social Security check to be deposited, because she noticed that money had been taken without her knowledge. According to Marian, after Cabrina argued with Martha about closing the bank account, Martha wanted to revoke the Trust Agreement and power of attorney to Andrew because things were not going the way Martha wanted. Marian testified that

12

she took Martha to see a lawyer so Martha could gain control of her property and income, and Martha filed the lawsuit and found out about the Gift Assignment. Marian testified that she told Martha she was losing her assets because Andrew was selling items using his power of attorney and buying new items in his name. According to Marian, Martha is happier since being out from under Andrew's influence.

Cabrina testified that she and Andrew moved into Martha's house in 2010, but they did not buy Martha's house. Cabrina explained that they paid Martha's bills with Martha's money. Cabrina also explained that in 2007, she received a power of attorney to handle Roy's and Martha's business, which required her to put their interest above her own. Cabrina testified that before Andrew became the owner of PAM, she handled matters for PAM at Andrews's direction without confirming with his parents because she was sure Andrew had already spoken with them. Cabrina further testified that mail concerning Roy's and Martha's legal or financial matters, including correspondence from Broussard, was sent directly to her house.

Cabrina explained that in 2005, the Property was significantly damaged by a hurricane, and they lost half of the tenants. According to Cabrina, after seeing the Property's damage, Roy told Andrew that he was done and that it was up to Andrew to continue with it. Cabrina explained that PAM was created after the hurricane, and PAM received a $490,000 SBA loan to repair its properties. Cabrina testified that

the SBA loan was guaranteed by PAM's properties and Andrew's income, and Andrew had to sign the note with Roy and Martha. Cabrina explained that in 2006, she spoke with Broussard about opening a bank account for PAM, setting up papers for Andrew to be president/secretary/manager and his parents as CEOs, and giving Andrew sole power of attorney and excluding Paul. Cabrina also explained that Andrew became the manager of PAM, and Roy wanted Andrew to take over.

Cabrina testified that in 2008, Roy and Martha executed the Second Amendment to the Trust Agreement, naming Andrew as trustee. According to Cabrina, Andrew ran PAM for several years prior to Martha gifting it to him in 2014, and that from 2010 to 2018, she and Andrew commingled their personal funds with PAM's account. Cabrina explained that she is the sole person who generates PAM's checks, and that Andrew signs off on the checks or tells her what to pay. Cabrina acknowledged that in 2012, she signed an email to Broussard representing herself as an owner of PAM despite not being an owner. Cabrina explained that in 2012, Andrew and Martha agreed to sell Diamond Emporium, which PAM owned, for $300,000, and after fees, they deposited approximately $251,000 into the PAM account. According to Cabrina, Martha still owned PAM in 2012. Cabrina testified that Martha agreed to let Andrew use the proceeds from Diamond Emporium to start his own business, Morrell Portable Buildings. Cabrina testified that Morrell Portable Buildings was more profitable than PAM, but Cabrina agreed that the negative

14

$9,445 income Morrell Portable Buildings reported on their 2014 income tax return did not sound very profitable. Cabrina also testified that she did not know whether their income in 2014 was enough to support their two children who were attending a private college, and she did not know who wrote her son a monthly check for $1,500, but it was probably Andrew.

Concerning Martha's March 2014 email to Broussard, which stated that she wanted to transfer all her assets to Andrew and which was forwarded to Andrew's email address with a note asking someone to read the email and see if it is what they want, Cabrina testified she did not know who had access to Martha's computer during that time but that if you went into Martha's room her computer was "right there[.]" Cabrina further testified that she did not have access to Martha's computer or know her passwords. Regarding the fire at the Tyler County property, Cabrina testified that Andrew filed an insurance claim for the loss of the dwelling, and she and Andrew received a $150,000 payment, which they deposited into PAM's account. Cabrina testified that they also received $8,000 for additional living expenses based on a claim that they were renting four rooms from Martha for $500 a month each, but Cabrina testified that they did not pay rent to Martha.

Cabrina explained that prior to Martha's first suicide attempt, Marian had been arguing with Martha about letting Marian run PAM. Cabrina also explained that Marian continued to argue with Martha about PAM after she returned from the

15

hospital. Cabrina denied telling Martha that she wished Martha would have finished the job and committed suicide. Cabrina testified that Andrew did not argue with Martha the night before her second suicide attempt. Cabrina explained that when Martha was at the hospital, Andrew was escorted out by security and Marian moved to Paul's house, and Martha told Andrew she wanted to return home but not with Marian. Cabrina testified that in 2017, the Tolivar Canal Road property flooded during Hurricane Harvey, and they moved with Martha to the Tyler County property where Martha and Marian still reside.

According to Cabrina, both Andrew and Martha filed claims and received money due to the flood, but she and Andrew own the Tolivar Canal Road property, which belongs to PAM, because Martha gifted PAM to Andrew on his birthday in 2014. Cabrina explained that Martha understood the effect of giving PAM to Andrew, and Andrew did not pressure or trick Martha into signing the Gift Assignment. Cabrina also explained that she had no prior knowledge about the Gift Assignment, but she knew that Andrew and Martha had discussed giving Andrew an ownership in PAM so he could get a loan to refurbish PAM's properties. Cabrina testified that some of the money from the fire claim and the sale of Diamond Emporium was used to repair and upgrade PAM's properties.

Broussard, a board-certified estate planning and probate attorney, testified that he has represented Roy, Martha, PAM, and Andrew. Broussard testified that in 2005,

16

Cabrina provided the paperwork he needed to prepare the certificate of formation for PAM, which was to be owned by Roy and Martha and managed by Andrew, Cabrina and Roy. Broussard testified that PAM's regulations included a section about assignment procedures, and that any assignment should comply with the regulations, which included the requirement that an assignment be duly executed and acknowledged. Broussard explained that he prepared the Gift Assignment from Martha to Andrew, which did not comply with the regulations because it was not acknowledged, but Broussard opined that the lack of an acknowledgement does make the Gift Assignment invalid. According to Broussard, the Gift Assignment could be voidable, but in his opinion, it is a completed gift because it complied with Martha's intent and it was accepted by Andrew.

Broussard testified that he mostly dealt with Appellants and that he sent all his bills to Andrew. According to Broussard in 2007, he sent Andrew powers of attorney for Roy and Martha to sign before a notary. Broussard testified that in October 2007, Martha and Roy executed a power of attorney appointing Appellants as their attorneys-in-fact effective immediately. Broussard explained that he was not relying solely on the power of attorney because he had been given the impression that Andrew was going to be handling Roy and Martha's real estate business. Broussard explained that under Texas Estate Code, a person who is appointed as a durable power of attorney is a fiduciary only when acting as an agent under the

17

power of attorney. Broussard testified that other formal and informal relationships can create a fiduciary duty.

Broussard explained that he also prepared the Second Amendment to the Trust Agreement, which placed Paul's and Marian's shares in a trust and appointed Andrew as trustee, and he sent the Second Amendment directly to Andrew. According to Broussard, Cabrina arranged for Roy and Martha to get to his office to execute the Second Amendment along with other documents he had prepared. Broussard testified that he represented Andrew concerning the fire insurance claim to help him prove that he had an insurable interest in the Tyler County property through the Trust Agreement, so Andrew could collect on the insurance policy he had despite not having legal title to that property.

Broussard explained that in September 2013, Andrew called about the ownership of PAM and the effect of Roy's will, and Martha called about her estate planning issues and intent to give away her membership interest in PAM and to give the Tolivar Canal Road property to Andrew. Broussard testified that Andrew wanted Martha's assets in his name because they needed additional funds to repair PAM's properties and the financial institution Andrew was working with requested that he have an ownership interest in PAM to complete the loan. Broussard testified that on March 28, 2014, he received an email from Martha stating that she wanted to transfer all her ownership in PAM to Andrew as soon as possible. Broussard further testified

18

that on April 3, 2014, his calendar shows that he met with Martha about completing the requested gift transfers, but after learning that Martha had attempted suicide and was in the hospital on that day, Broussard testified that the meeting must have been with Andrew. Broussard explained that on April 14, 2014, he met with Martha about her estate planning and the transfer of PAM, and he advised against putting her assets in Andrew's name because it left Martha without any control. Broussard further explained that he received an email from Martha on that same day at 11:58 p.m. stating that she understood the reasons why Andrew wanted her to put her assets in his name, she wanted to transfer everything except the Tyler County property, and she was making the decision to do so with a clear mind and full understanding of what that would entail.

According to Broussard, Paul and Marian came to his office after his April 14 meeting with Martha because they were concerned about Martha's health and the influence over her, and Broussard told them he did not provide that type of assistance and directed them to Adult Protective Services. Broussard testified that he learned Martha attempted suicide the day after she sent the email requesting him to transfer her assets, and he stated knowing that would make him exercise some caution and concern. Broussard explained that he received an email from Marian containing voice recordings of Martha, but he did not know the context of the recordings or Martha's state of mind. Broussard also explained that he learned during trial that

19

there had been two suicide attempts, and that such information would make him very concerned.

In determining whether a client's wishes are being fulfilled, Broussard explained that he must exercise his judgment based on his observations at the office and the information the client provides, and he testified that he did not have any information about Martha's circumstances at home. According to Broussard, he spoke with Martha about whether she was being unduly influenced by Andrew before she signed the Gift Assignment; Broussard was satisfied that Martha was not being unduly influenced, and she understood the nature of the transaction and the effect of the transfer documents he prepared, which also included transferring the Tyler County property from PAM to Martha and then to the Trust. Broussard explained that he could have been wrong about whether there was undue influence.

Andrew testified that he owns 100% of PAM due to the Gift Assignment, and he is unwilling to give Martha the business back because he has moved on. Andrew testified that PAM has supported him his entire life, and he has paid his family's expenses, his personal bills and his children's school tuition out of PAM's account. According to Andrew, education was always important to his parents, and Martha insisted that his children attend private school. Andrew testified that he has put his personal and rental income, Morrell Portable Building's income, and the profit from the sale of his home into PAM. Andrew testified that he did not pressure Martha into

20

giving him PAM and that he only had discussions with Martha about giving him part ownership to make doing business easier. Andrew explained that he had access to Martha's computer and email and knew her password, but he could not recall if he had sent any emails from her computer. Andrew testified that he received an email from Martha in April 2014, telling him that she wanted to give him all her assets, but Andrew claimed he did not want all her assets. According to Andrew, he was surprised when Martha gifted him PAM for his birthday, and Martha was happy about it.

Andrew testified that Martha sent Broussard "a lot of different emails with different scenarios." Andrew further testified that he did not meet with Broussard on April 3, 2014, when Martha was in the hospital. Andrew explained that he did not have any conversations with Martha the night before her second suicide attempt or help Martha prepare the email that was sent to Broussard that same night stating that she wanted to transfer all her property ownership to Andrew, and Andrew did not recall forwarding that email or any other email to himself or Cabrina while Martha was in the hospital. Andrew testified that he cashed a $32,000 check while Martha was in the hospital, leaving the account in the negative, but he did not recall what the check was for. Andrew testified that Martha wanted to come home with him after her second suicide attempt, but she did not want Marian there, and after Marian left everything was fine until Hurricane Harvey hit in August 2017.

21

Andrew explained Martha and Marian started talking again when Paul developed colon cancer in May 2017, and when the Tolivar Canal Road property flooded in Hurricane Harvey, Andrew's family and Martha evacuated to the Tyler County property and stayed there until Martha filed the lawsuit. Andrew testified that in 2018 and 2019 Morrell Portable Buildings grossed $600,000 or $700,000. Andrew explained that he used PAM's money to start and build Morrell Portable Buildings, and his business has paid back money to PAM. Andrew further testified that the most PAM has grossed is $150,000, which is about all it can generate based on the square footage of the Property. According to Andrew, the Property's land is worth more than the improvements. Andrew also explained that since 2005, he has used PAM's account to pay the monthly payments on PAM's SBA loan.

Concerning the fire insurance claim, Andrew testified that he signed the application, which misrepresented that the title of the Tyler County property was in his name. Andrew also testified that he did not know who decided to make a claim for additional living expenses based on the representation that they were renting four rooms at Martha's for $500 each. Andrew explained that he did not pay rent to Martha but accepted the payment for additional living expenses despite knowing it was insurance fraud. According to Andrew, Martha received the money and charged them for rent during that period because she was "in on it." Andrew testified that he put all the insurance money in PAM's account.

22

Andrew testified that if the trial court awarded PAM to Martha, she would be responsible for paying back a $100,000 loan that he took out. Andrew also testified that the balance in PAM's account was $250,849.10 in September 2012, $11,463.66 in May 2013, and $3,287.36 in September 2019. According to Andrew, PAM generates $12,000 in monthly rent. Andrew explained that he took $28,000 from PAM to purchase the Hazen property in his name and used PAM's money to pay for his son's apartment. Andrew also explained that in August 2013, he was not the owner of PAM, but that month when Diamond Emporium sold for $251,338. 96, he withdrew $20,000 in cash and paid $33,623.54 for a Mercedes. Andrew admitted that in June 2014, which was before he owned PAM, he filed a financial statement at the bank stating that he had income from PAM when he didn't, but Andrew claimed it was not fraud because he was the manager and had power of attorney. Andrew also testified that the bank account for the Trust Agreement has him and Cabrina listed as trustees even though they are not, and he explained that it did not really bother him that the bank "made a typo."

Martha testified that in 2005 Andrew asked to manage the Property's business so she could take care of Roy. Martha explained that she trusted Andrew at that time, but he was very insistent and always wanted to be the boss. Martha testified that it looked like she signed the Second Amendment, but she did not recall seeing it before. According to Martha, Andrew would tell her and Roy to go see Broussard,

who she referred to as Joey, and Broussard would hand them a bunch of papers they would sign. Martha explained that she had always done what Andrew wanted; if she did not, he would get upset, scream at her, and call her names.

Martha testified that after Hurricane Rita hit in 2005, she got an SBA loan in her name for approximately $400,000, which she personally guaranteed, and she still owes almost that much on the loan. Martha also testified that in 1995 she and Roy borrowed $160,000 to build their house on Tolivar Canal Road, in 2003 they refinanced for $5,000 to pay taxes, and she currently owes $165,000 on the house. According to Martha, Andrew was responsible for making the payments for those two loans, and she is disappointed in the businessperson he turned out to be because "there's more money owed now than ever."

Martha testified that after Roy died, Andrew wanted to move in with her because of his financial situation and the strain of putting his son through college, but she did not think it would be permanent. Martha testified that she just wanted to get along with Appellants because if she did not, they would isolate her and mock her behind her back. Martha explained Andrew wanted everything transferred to him because he thought he should get it for managing the Property. According to Martha, Andrew was greedy, disingenuous and a bully, and Cabrina was untruthful. Martha testified that she let Andrew handle her finances because she did not think she had a choice and she thought he was a better businessman than he was.

Martha explained that Andrew got angry with her very often and it would scare her, and her attorney admitted a videotape of an altercation between Martha and Andrew, showing Andrew yelling and calling Martha names. According to Martha, Andrew ran everyone off, and she felt isolated and alone. Martha explained that after Andrew's daughter attempted suicide, she reached out to Marian and talked her into coming home because she wanted to be with somebody who liked her. Martha testified that Marian never pressured her and had only tried to help her get out from under Andrew's control.

Martha also explained that she only emailed her grandchildren and had never emailed Broussard, and Martha believed that either Andrew or Cabrina sent the emails to Broussard pretending to be her. Martha testified that in 2013 her computer was on her desk in her bedroom, everybody had access to it, the passwords and codes were on sticky notes, and she gave Andrew her passwords to help her with things. According to Martha, Andrew kept telling her to go to Broussard's office to sign papers, but it took him months to get her to go because she did not want to divide up her assets and have him take everything. Martha testified that she was miserable and there was no point in giving everything away.

Martha explained that Andrew was putting a lot of pressure on her to give him everything, and she did not remember a lot about the first time she went to the hospital. According to Martha, the first incident may have been more of a panic

25

attack, but the second time she attempted suicide because she was hopeless and could not get away from Andrew. Martha testified that after she returned home from the hospital, Cabrina asked her why she did not take the whole bottle. Martha testified that the night before the second attempt, Andrew yelled at her for at least four hours about signing papers so he could get what he wanted. According to Martha, suicide seemed like the only way to get out of the situation. Martha explained that she went home with Andrew after leaving the behavioral clinic because she had no other place to go, and she did not tell Andrew that she wanted to throw Marian out, but Andrew did it to isolate her.

Martha testified that it was her signature on the Gift Assignment, but she explained that the first time she recalled seeing the document was after she filed the lawsuit. Martha testified that she did not want to give Andrew 100% of PAM, but Andrew wanted her to do things she did not want to do. Martha testified that after she signed the Gift Assignment she continued to live with Andrew, but she was treated "pretty shabby." According to Martha, after the Tolivar Canal Road property flooded, she was isolated at the Tyler County property with only her Social Security to live on, and she had to close her bank account because Appellants spent her Social Security.

Martha explained that she decided to file the lawsuit because she no longer wanted to live in an isolated condition with no car, house, or business. Martha further

explained that she "would like to have what I worked for back[,]" and that included PAM, the Tolivar Canal Road property, the money Andrew collected for the Property's rental income for the past five years, the proceeds from the sale of Diamond Emporium, and the proceeds from the fire insurance claim. Martha also wanted Andrew to pay off the debt on the $100,000 loan he took out in December 2018. Martha explained that Andrew has damaged PAM and her assets, and Appellants violated her trust by mismanaging PAM. Martha also explained that Andrew unduly influenced her to sign the Gift Assignment and his actions completely overpowered her mentally. According to Martha, Andrew "bullied and badgered her into doing it."

Andrew called his daughter, Caitlin Morrell, to testify on his behalf. Caitlin testified that she moved in with Martha when she was a sophomore in high school and saw Martha daily for three years until she left for college. Caitlin explained that she never saw Andrew try to coerce Martha and that Andrew tried to make Martha happy and comfortable. Caitlin testified that Martha was excited and relieved after she gave PAM to Andrew.

Nicholas Morrell, Andrew's son, also testified on Andrew's behalf. Nicholas testified that he was in college when his family moved in with Martha, and he saw Martha when he was home on breaks. Nicholas testified that he never saw Andrew bully or coerce Martha. According to Nicholas, Andrew tried to help Martha, and he

was always reinvesting money into PAM because the buildings were old. Nicholas explained that PAM only survived because it was backed by Morrell Portable Buildings. Nicholas testified that Andrew would not unduly influence Martha, and Andrew would not have wanted to have the property with all the debt and let go of the debt free property with mineral rights.

Andrew also testified on his behalf. Andrew explained that the Property nets approximately $5,000 to $6,000 per month. Andrew testified that in 2002 or 2003, Martha refinanced the Tolivar Canal Road property for $300,000. Andrew also testified that the original amount of the SBA loan was $490,000, and the current balance is approximately $260,000. Andrew explained that the PAM $100,000 line of credit is an inventory account for Morrell Portable Buildings. Andrew also explained that he put the money he received from the fire insurance claim and the sale of Diamond Emporium into PAM's account, and that money was used to repair and upgrade the Property, pay property taxes, start Morrell Portable Buildings, buy a Mercedes, and to pay off small things. However, Andrew testified that he could not offer any proof to show that he spent the money on the Property.

Martha made an oral motion for a directed verdict regarding her request for a declaratory judgment that the Gift Assignment is void as a matter of law because it fails to comply with PAM's regulations that assignments must be acknowledged and contain representations of compliance with security laws. In Appellants' Response

to Motion for Instructed Verdict, Appellants argued that Martha's motion should be denied because her pleadings do not assert a claim for recovery based on the Gift Assignment's failure to comply with PAM's regulations, but only that the Gift Assignment is void based on theories of undue influence and breach of fiduciary duty. Appellants further argued that the Gift Assignment is not void as a matter of law and that Andrew determined that it substantially conformed to PAM's regulations and recorded it in PAM's books.

Martha filed a Reply to Appellants' Response to Instructed Verdict in which she argues that her Third Amended Petition gave Appellants fair notice that she brought a declaratory judgment to declare the Gift Assignment void for any reason, despite not providing all the reasons. According to Martha, her pleadings alleged that the Gift Assignment is void due to undue influence and other blatant breaches of fiduciary duty, which includes Andrew's failure to comply with PAM's regulations. Martha argued that the Texas Civil Practice and Remedies Code states that the Texas Declaratory Judgment Act is to be liberally construed and administered and that the trial court has the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed, and that an interested person may have determined any question of construction or validity arising under an instrument. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.002(b), 37.003(a), 37.004(a). Martha also argued that Broussard's unobjected testimony

29

about the PAM regulations and the validity of the Gift Assignment shows that the issue of whether the Gift Assignment was void because of its failure to comply with the regulations was tried by consent. *See* Tex. R. Civ. P. 67.

Martha filed a Post-Trial Brief and Closing Arguments, in which she argued that the evidence supported findings of undue influence and breach of fiduciary duty and that the trial court should find that the Gift Assignment is a result of undue influence and award Martha $801,000 in actual damages. Martha requested a declaration that the Gift Assignment is void because it fails to comply with PAM's regulations along with the following equitable relief: recission of the Gift Assignment; constructive trust on the Hazen property and two adjacent rental properties; constructive trust and declaration that Morrell Portable Buildings is an asset of PAM; and a permanent injunction enjoining, among other things, Appellants from receiving or depositing any income for PAM, the Trust Agreement or Martha.

Appellants also filed a Post-Trial Brief and Closing Arguments, arguing that the Gift Assignment was a valid gift and not the result of undue influence. Appellants argue that Martha failed to testify that her mind was overpowered at the time she signed the Gift Assignment, and that Martha's testimony is not credible and inconsistent because she did not even recall signing the Gift Assignment but claimed that she signed it because Andrew pressured her. Appellants also argued that they did not breach any fiduciary duty they owed to Martha. Appellants explained that

30

they had a duty as informal fiduciaries to fully and fairly disclose all information to Martha concerning transactions and to be fair and equitable to Martha. According to Appellants, Martha is seeking damages for the following transactions that were made after the Gift Assignment: the fire insurance proceeds; the sale of Diamond Emporium; rent collected from the Property over a five-year period; and the line of credit for Morrell Portable Buildings; but the evidence shows these funds were deposited into PAM and Martha failed to show how Appellants profited from those transactions. According to Appellants, Martha was aware of and approved the transactions, and they met their fiduciary duties in every respect.

Martha also filed a Post-Trial Brief and Rebuttal, in which she argued that she testified that if she signed the Gift Assignment, it was because at the time her mind was overpowered by Andrew. Martha also argued that Appellants failed to show they complied with their fiduciary duty because they did not prove every element in the Texas Pattern Jury Charge. According to Martha, she does not have to show that Appellants profited from the transactions, but only that they benefited from them. Martha further argued that she never testified that she agreed to Andrew's expenditures and Andrew failed to present evidence that the money was properly spent.

The trial court signed a Final Judgment granting Martha's Motion for Directed Verdict and finding that: (1) the Gift Assignment is void because it fails to comply

with PAM's regulations; (2) the Gift Assignment is further void and of no force and effect because it was the product of undue influence exerted by Appellants; (3) Appellants had a fiduciary duty to Martha; (4) Appellants benefited from the transactions at issue, had the burden to prove they complied with their fiduciary duty, but failed to meet their burden of proof; and (5) Appellants breached their fiduciary duty to Martha. The trial court awarded Martha $801,000 in total actual damages.

The trial court also found that because Appellants breached their fiduciary duty, Martha was entitled to the following equitable relief: the recission of the Gift Assignment as void and a declaration that Martha is the sole owner of 100% of membership interests in PAM; a constructive trust in favor of Martha on four pieces of property belonging to Appellants, including the Hazen property; and a constructive trust and declaration that Morrell Portable Buildings is owned by PAM. The trial court further found that Martha was entitled to permanent injunctive relief from Appellants, including, among other things, that Appellants immediately vacate all property owned by PAM or the Trust Agreement, including the Tolivar Canal Road property. The trial court dismissed all of Appellants' claims and counterclaims against Martha with prejudice. The trial court issued Findings of Fact and Conclusions of Law.

Appellants filed a Motion for Judgment as a Matter of Law and Motion for New Trial, in which they argued, among other things, that Martha did not have

capacity or legal standing; there is legally insufficient evidence to support both the trial court's directed verdict that the Gift Assignment is void and the finding that Appellants breached a fiduciary duty to Martha; the award of damages is excessive and supported by legally insufficient evidence; and the trial court's issuance of injunctive relief is erroneous and supported by legally insufficient evidence. The trial court denied Appellants' Motion for Judgment as a Matter of Law and Motion for New Trial. At Appellants' request, the trial court issued Additional Findings of Fact and Conclusions of law including, among others, that there were informal and formal fiduciary relationships between Appellants and Martha; the Gift Assignment, management of PAM, and spending of Martha's money were instances of self-dealing by Appellants; Martha did not benefit from the self-dealing transactions in question; Appellants did benefit from the transactions at the expense of Martha; Appellants breached their fiduciary duty and caused injury to Martha; insurance proceeds were deposited into PAM's account and Appellants spent the money for their own benefit; proceeds from the sale of Diamond Emporium were deposited into PAM's account and Appellants spent the money for their own benefit; Martha sustained damages of $801,000, proximately caused by Appellants' breach of fiduciary duty; Martha did not wrongfully exercise dominion over Appellants' property; Martha did not trespass on Appellants' land; and the finding that Andrew committed some form of fraud is relevant to Appellants' credibility.

33

ANALYSIS

DECLARATORY JUDGMENT THAT GIFT ASSIGNMENT IS VOID

In issue one, Appellants argue the trial court erred by invalidating the Gift Assignment based on its failure to comply with PAM's regulations because the judgment does not conform to the pleadings and the issue was not tried by consent. According to Appellants, the absence of an acknowledgment by a notary public is not grounds to set aside the Gift Assignment. Appellants also argue that the trial court erred by rescinding the Gift Assignment because it found that it was the result of undue influence. According to Appellants, the evidence is legally and factually insufficient to support the trial court's finding of undue influence.

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses and weight of the evidence and is responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). The factfinder may choose to believe one witness over another, and we may not substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) When a trial court makes specific findings of fact and conclusions of law following a bench trial and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review

34

the legal conclusions drawn from the facts to determine their correctness. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.). "Findings of fact 'have the same force and dignity' as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency." *Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citation omitted). We review a trial court's conclusions of law as legal questions, *de novo*, and will uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller*, 168 S.W.3d at 827. When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *see also Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). In a factual sufficiency review, we examine all the evidence, and we will set aside the judgment if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176

(Tex. 1986). Unlike a legal-sufficiency review, a factual-sufficiency review requires us to review all the evidence in a neutral light. *See id.*

Undue Influence

The Appellants complain that the trial court erred by rescinding the Gift Assignment based on undue influence. Appellants challenge the trial court's findings and conclusions that the Gift Assignment was the result of undue influence. In Texas, "[t]he rules guiding a determination of the existence of undue influence apply substantially alike to will, deed, and other instruments." *Bradshaw v. Naumann*, 528 S.W.2d 869, 871 (Tex. Civ. App.—Austin 1975, writ dism'd) (citations omitted). To set aside an instrument based on undue influence, the party claiming undue influence must prove: (1) the existence and exertion of influence; (2) the effective operation of such influence as to subvert or overpower the mind of the property owner at the time instrument was executed; and (3) the execution of an instrument that the property owner would not have executed but for such influence. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). To satisfy the first element, the party contesting an instrument must show that an undue influence existed and was exerted. *See id.* The contesting party focuses on facts showing the opportunities for the exertion of the alleged influence, the circumstances of the drafting and execution of the instrument, the existence of a fraudulent motive, and whether the person was executing the instrument was habitually under the control of another. *Id.*

36

at 923. There must be proof showing both that the influence existed and that it was exerted. *Id.*

To satisfy the second element, the contesting party must show that the exertion of the influence subverted or overpowered the mind of the property owner at the time she signed the instrument. *Id.* at 922. The focus of this element is on the property owner's state of mind and evidence relating to her ability to resist or susceptibility to the influence of another, such as mental or physical infirmity. *Id.* at 923. Influence is "undue" when the property owner's volition is destroyed, and the resulting instrument expresses the wishes of the one exerting the influence. *Id.* at 922. Undue influence may include force, intimidation, duress, persistent requests, demand, or deceit. *Id.*

To meet the third element, the contesting party must show that the property owner would not have executed the challenged instrument but for the undue influence. *Id.* In general, this element focuses on whether the instrument makes an unnatural disposition of property. *Id.* at 923. A disposition may be unnatural, for example, if it excludes a property owner's natural heirs or favors one heir at the expense of others who ordinarily would receive equal shares. *See Long v. Long*, 125 S.W.2d 1034, 1036 (Tex. 1939). A property owner's preference for one beneficiary over others may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that call the preference into question or discredits

it. *See Rothermel*, 369 S.W.2d at 923-24; *Curry v. Curry*, 270 S.W.2d 208, 213 (Tex. 1954).

As evidenced by our summary of the testimony above, the evidence supports the trial court's finding that there was direct testimony of undue influence including: Marian's testimony of the treatment, abuse, and influence being exerted by Andrew; Marian and Paul's attempts to warn Broussard; audio recordings of Martha in the hospital after attempting suicide discussing how Andrew isolates her and how she wants to change the Trust Agreement from Andrew; video showing Andrew's treatment of Martha; testimony regarding Andrew being a bully and argumentative; Andrew's less than credible testimony that he did not have prior knowledge about the Gift Assignment; Andrew's admission he had access to Martha's email password; and Andrew's actions of removing money from PAM's account and gathering emails between Martha and Broussard while Martha was in the hospital. The evidence as summarized above also supports the trial court's finding that the following factors supported a finding of undue influence: the nature of the relationships between Martha and Appellants; the opportunities for the exertion of undue influence; the circumstances surrounding the drafting and execution of the Gift Assignment; the existence of fraudulent motives of Appellants; the habitual subjection of the will of Martha to the control of Appellants; the state of Martha's mind when the Gift Assignment was executed; Martha's mental or physical

incapacity to resist or the susceptibility of Martha's mind to the type and extent of the influence exerted evidenced partly by her suicide attempts; the words and acts of Martha; the weakness of Martha's mind and body produced by infirmities of her age or other illness; and the Gift Assignment's unnatural disposition of Martha's property.

Additionally, Martha testified that Andrew unduly influenced her to sign the Gift Assignment because he "bullied and badgered her into doing it[,]" and Martha explained that Andrew's actions completely overpowered her mentally. Martha also explained that she did not want to give Andrew 100% of PAM, because she did not want to divide up her assets and have him take everything. As the sole judge of the credibility of the witnesses, the trial court was free to believe Martha and disbelieve Appellants and their children. *See City of Keller*, 168 S.W.3d at 819; *Jackson*, 116 S.W.3d at 761. We conclude the evidence is legally and factually sufficient to support the trial court's finding that the Gift Assignment was the result of undue influence, and the judgment is not so contrary to the weight of the evidence to be clearly wrong and unjust. *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176. Accordingly, the trial court did not err by finding that the Gift Assignment is void because it is the product of undue influence.

Failure to Comply with PAM's regulations

Having concluded that the trial court did not err by finding that the Gift Assignment was void because of undue influence, we need not determine whether the trial court erred by invalidating the Gift Assignment because it failed to comply with PAM's regulations as it would not result in any greater relief for Appellants. *See* Tex. R. App. P. 47.1. We overrule issue one.

## STANDING AND INSUFFICIENT EVIDENCE OF DAMAGES

In issue two, Appellants argue that Martha lacks standing to seek personal recovery of damages allegedly sustained by PAM and to make derivative claims on PAM's behalf. According to Appellants, the evidence is legally and factually insufficient to support damages sustained by Martha personally, including the imposition of a constructive trust. Martha argues that her claims seek damages for wrongs committed against her individually, and to recover in her individual capacity she only had to prove her personal causes of action of undue influence and breach of fiduciary duty caused her a personal injury.

Standing is a component of a trial court's subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993). We review questions of standing *de novo*, and in our evaluation, we construe the pleadings in the plaintiff's favor and consider evidence relevant to the jurisdictional inquiry. *Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*, 598 S.W 3d 237, 240 (Tex.

40

2020) (citation omitted). "'In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court.'" *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018) (citations omitted). To show that she had been personally injured, a plaintiff must demonstrate that she, herself, suffered the injury. *See Meyers*, 548 S.W.3d at 484 (citations omitted). While a stakeholder in a business organization cannot recover damages personally for a wrong done solely to the organization, this rule does not prohibit a recovery for damages for wrongs done individually where the wrongdoer violates a duty owed directly to the stakeholder. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 776, 778 (Tex. 2020) (discussing lost value of an interest in organizations and statutory claims); *see Wingate v. Hajdik*, 795 S.W. 717, 719 (Tex. 1990), *superseded by statute on other grounds as stated in Sneed v. Webre*, 465 S.W.3d 169, 185 n.10 (Tex. 2015) (explaining a stockholder may recover for individual wrongs done to him where the wrongdoer violates a duty owed directly to the stockholder). A stakeholder in a business organization also has constitutional standing to sue for an alleged loss in the value of her interest in the organization. *See Pike*, 610 S.W.3d at 778. The question of whether the stakeholder lacks standing to bring claims individually, goes to the merits of the claim and does not concern subject matter jurisdiction. *See id.* at 777-78.

The record shows that Martha filed suit in her individual capacity to vindicate her rights against Appellants for breaching their fiduciary duty to her and securing the execution of the Gift Assignment by undue influence. Martha did not file a derivative claim, allege claims that belonged solely to PAM, or seek to recover damages personally for a wrong done solely to PAM. Moreover, PAM did not have standing to bring Martha's claims for breach of fiduciary duty and undue influence because those claims are individual to Martha and required her participation in the lawsuit. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 447–48. We conclude that because Martha's claims concern duties Appellants owed to Martha in her individual capacity and are not claims belonging to PAM, Martha had standing to seek damages for wrongs committed against her individually. *See Pike*, 610 S.W.3d at 776, 778; *Meyers*, 548 S.W.3d at 484; *Wingate*, 795 S.W. at 719.

We also disagree with Appellants' contention that the evidence is legally and factually insufficient to support damages sustained by Martha personally for breach of fiduciary duty, including the imposition of a constructive trust. According to Appellants, the evidence established the alleged damages were sustained by PAM, not Martha. Since the trial court awarded damages, including equitable relief, to compensate Martha for Appellants' breach of their fiduciary duty to Martha, the damages were for injuries personally sustained by Martha and not PAM. *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (providing

42

that court may fashion equitable remedies to remedy a breach of fiduciary duty); *Young v. Fawcett*, 376 S.W.3d 209, 215–16 (Tex. App.—Beaumont 2012, no pet.) (providing a court may impose a constructive trust on property obtained as a result of a breach of fiduciary duty). We conclude the evidence is legally and factually insufficient to support damages sustained by Martha personally. We overrule issue two.

BREACH OF FIDUCIARY DUTY

In issue three, Appellants argue that the trial court erred by finding that they breached a fiduciary duty to Martha because Martha failed to show that they breached any of their formal power of attorney duties they owed Martha and because Martha failed to show an informal fiduciary relationship existed at the time of any alleged transactions at issue. According to Appellants, Martha's testimony established that any trust relationship between Martha and Appellants ceased to exist no later than April 2014. Appellants contend that, apart from the proceeds from the fire insurance claim and the sale of Diamond Emporium, most of the transactions occurred after April 2014. Appellants argue that Martha's claims fail as to her attempts to recover for the Gift Assignment, $300,000 for net rent collected after the Gift Assignment, and PAM's $100,000 line of credit. Martha argues that the trial court found that there was a formal and informal fiduciary relationship between her and Appellants and that either relationship can support the trial court's finding that

43

Appellants breached their fiduciary duty. According to Martha, Appellants provided no authority showing that trust alone is enough to create or destroy a fiduciary relationship.

To prevail on a claim for breach of fiduciary duty, Martha must prove the existence of a fiduciary duty, a breach of that duty by Appellants, causation, and damages. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). When a plaintiff alleges self-dealing by the fiduciary as part of their claim for breach of fiduciary duty, as in this case, a presumption of unfairness arises, which the fiduciary bears the burden to rebut. *Cluck v. Mecom*, 401 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citations omitted). A fiduciary duty generally "arises from the relationship of the parties and not from the contract." *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984) (citations omitted). "Where one person is accustomed to being guided by the judgment or advice of another or is justified in believing one will act in the best interest of another because of a family relationship, a confidential relationship may arise." *Trostle v. Trostle*, 77 S.W.3d 908, 914 (Tex. App.—Amarillo 2002, no pet.) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). A person's trust and reliance upon a close member of her core family unit may give rise to a fiduciary duty when equity requires. *See Young*, 376 S.W.3d at 214 (citation omitted).

44

The existence of a confidential relationship is a question of fact. *Ludlow v. DeBerry*, 959 S.W.2d 265, 279 (Tex. App.—Houston [14th Dist.] 1997, no writ) (citation omitted). "An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic or merely personal one." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997) (citations omitted). "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen*, 363 S.W.2d at 253. In reviewing the relationship between the parties, factors we consider include the plaintiff's advanced age and poor health and whether the plaintiff justifiably placed special confidence in the other party to act in her best interest. *See Trostle*, 77 S.W.3d at 914-15.

An informal fiduciary relationship requires proof that, because of a close or special relationship, the plaintiff "is in fact accustomed to be guided by the judgment or advice" of the other. *See Thigpen*, 363 S.W.2d at 253 (citation omitted). "A fiduciary owes its principal a high duty of good faith, fair dealing, honest performance and strict accountability." *Ludlow*, 959 S.W.2d at 279 (citation omitted). A party fails to comply with their fiduciary duty "'where influence has been acquired and abused, and confidence has been reposed and betrayed.'" *Lee v. Hasson*, 286 S.W.3d 1, 14-15 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citations omitted).

The record shows that Martha was in advanced age and at times in poor mental health, she had an informal fiduciary relationship with Appellants, and she trusted and relied on their judgment in taking care of her personal and business interests. *See Thigpen*, 363 S.W.2d at 253; *Young*, 376 S.W.3d at 214; *Trostle*, 77 S.W.3d at 914. Martha testified that she and Roy allowed Andrew to manage the Property's business, and that she completely trusted him to handle her business and finances. According to Martha, Andrew and Cabrina had been paying the bills for several years prior to moving in with her. Martha explained that she followed Andrew's advice about forming PAM, amending the Trust Agreement, and signing documents that Broussard drafted at Andrew's instruction because she trusted Andrew. Martha testified that she trusted Andrew to manage the Property, pay off debt, and pay the bills, but Appellants have violated her trust and she did not approve all the expenditures. According to Martha, she stopped trusting Andrew when she found out he was stealing money and not working in her interest.

Andrew testified that he understood that as a fiduciary that you are supposed to look out for the other person's personal interest, which he did, but Andrew agreed that he also benefited from PAM and lived off its proceeds. Andrew explained that after 2005, he and Cabrina managed PAM for his parents and paid the bills. Andrew testified that Martha gave him and Cabrina the right to manage and help with her bills, and he paid Martha's expenses and kept her informed of PAM's business.

46

According to Andrew, he ran PAM, but he recognized it was Martha's and he tried to do his best by her. Andrew testified that he met with Broussard on Martha's behalf and discussed Martha's business. Additionally, Broussard testified that he mostly dealt with Appellants and had been given the impression that Andrew was handling Martha's real estate business.

Cabrina testified that beginning in 2005, she handled the family's financial and personal matters, which included accessing bank accounts and communicating with attorneys and accountants. Cabrina also testified that she paid Martha's bills with Martha's money. According to Cabrina, she and Martha had a general trusting relationship and she handled affairs for Martha's benefit and best interest. Cabrina explained that Martha trusted her, and she put Martha's interests above her own.

The record establishes evidence supporting the findings that a relationship of trust and confidence existed between Martha and Appellants to the extent that it created an informal fiduciary relationship, and that Martha, who was of advanced age and had poor mental health at times, justifiably trusted and relied on Appellants for financial guidance. Although Appellants contend that Martha's testimony shows that any informal fiduciary relationship ended no later than April 2014 because she testified that she lost trust in Andrew, Appellants have failed to cite to any authority supporting their contention that such testimony automatically negates the existence of an informal fiduciary relationship.

47

Thus, the record supports the trial court's findings that the nature of the transactions that took place during their fiduciary relationship include the Gift Assignment, management of PAM for the benefit of Appellants, and the spending of Martha's money and assets. We conclude the evidence is legally and factually sufficient to support the trial court's findings that a fiduciary relationship existed between Martha and Appellants and that Appellants breached their fiduciary duties, and the judgment is not so contrary to the weight of the evidence to be clearly wrong and unjust. *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176. We overrule issue three.

## DENIAL OF JURY TRIAL

In issue four, Appellants complained that they were wrongfully deprived of a jury trial. According to Appellants, the trial court erred by denying their request for a jury trial and removing the case from the jury docket without affording them a reasonable opportunity to formally request a jury or pay the jury fee, and that the trial court also erred by refusing to grant a continuance.

We review the trial court's denial of a jury demand for abuse of discretion. *Interest of A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019). We must examine the entire record, and we will conclude that the trial court abused its discretion only if its decision was arbitrary, unreasonable, and made without any reference to guiding principles. *See id.* In a civil case, the right to a jury trial arises only when a party

files a written jury request not less than thirty days before the date the case is set for trial and pays the jury fee. Tex. R. Civ. P. 216. A trial court does not abuse its discretion by denying a jury trial when a request was not timely made. *Huddle v. Huddle*, 696 S.W.2d 895, 895 (Tex. 1985); *Sunesara v. Prappas*, No. 09-16-00088-CV, 2017 WL 2698060, at *4 (Tex. App.—Beaumont June 22, 2017, no pet.) (mem. op.). The denial of a motion for continuance is within the sound discretion of the trial court, and we will not reverse the trial court's decision unless the record shows a clear abuse of discretion. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986).

As discussed above, Appellants failed to timely file a written request for a jury or pay a fee, and thus they were not entitled to a jury trial. Although Appellants argue that the Agreed Amended Discovery Control Plan Order shows that the case was set for a jury trial, Martha's counsel argued that multiple dockets evidenced that the case was set for a nonjury trial, and the trial court agreed that it had sent out three dockets that said nonjury. The trial court did not abuse its discretion by denying the request for a jury trial. *See* Tex. R. Civ. P. 216; *Huddle*, 696 S.W.2d at 895; *Sunesara*, 2017 WL 2698060, at *4. The record further shows that the trial court conducted a hearing on Appellants' motion for continuance, during which Appellants asked the trial court to continue the case until their jury demand was timely filed, but Martha's counsel argued that a continuance would be extremely unfair and prejudicial due to Martha's health. We conclude that the trial court did not abuse its discretion by denying

Appellants' motion for continuance. *See Villegas*, 711 S.W.2d at 626. We overrule issue four.

## DOUBLE RECOVERY

In issue five, Appellants complain the evidence is legally and factually insufficient to support Martha's claim for excessive damages allegedly caused by Appellants' breach of fiduciary duties because such damages amount to a double recovery. According to Appellants, Martha was awarded PAM and its bank account, but Martha cannot recover PAM and the funds that were deposited into PAM and used for PAM's financial benefit. Martha argues that the record does not show that she received a double recovery, because the record shows that the trial court awarded her PAM and the money Appellants took from PAM, but not PAM's bank account. According to Martha, even if she was awarded PAM's bank account, receiving an account with a zero balance is not an impermissible double recovery.

A double recovery exists when a plaintiff is awarded more than one recovery for the same injury. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). There is no double recovery when a plaintiff recovers a property that is wrongfully taken and for damages suffered while the property was wrongfully withheld. *See Vickery v. Vickery*, 999 S.W.2d 342, 373-74 (Tex. 1999) (citation omitted); *see also Stum v. Stum*, 845 S.W.2d 407, 416 (Tex. App.—Forth Worth 1992, no writ) (stating that trial court awarded specific damages in the return

50

of property and actual damages for unaccounted rentals and converted sums and assets of the business).

Martha pleaded for both the return of her assets and actual damages for Appellants taking possession of her assets and income without authorization or consent. The record shows that based on Appellants' breach of their fiduciary duty, the trial court awarded Martha $801,000 in actual damages and the return of her property through equitable relief. Specifically, the trial court found that Martha suffered damages for the following amounts of money that Appellants should have accounted for: $150,000 in fire insurance proceeds; $251,000 from the sale of Diamond Emporium; $300,000 for net rent collected from Gift Assignment to present; and PAM's $100,000 line of credit.

The record shows that Andrew testified that if the trial court awarded PAM to Martha, she would be responsible for paying back a $100,000 loan that he took out. Andrew testified that in August 2013, he was not the owner of PAM when Diamond Emporium sold for $251,338.96. Andrew explained that he put the money he received from the fire insurance claim and the sale of Diamond Emporium into PAM's account, and that he used the money to repair and upgrade the Property, pay property taxes, start Morrell Portable Buildings, buy a Mercedes, and pay off small things. However, Andrew testified that he could not offer any proof to show that he spent the money on the Property. Andrew also explained that the Property nets

approximately $5,000 to $6,000 per month in rental income. Andrew testified that the balance in PAM's account was $250,849.10 in September 2012, $11,463.66 in May 2013, and $3,287.36 in September 2019. We conclude that Appellants have failed to show the trial court's award of $801,000 in actual damages results in a double recovery to Martha. We overrule issue five. Having overruled each of Appellants' issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on October 14, 2021
Opinion Delivered March 31, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.